UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                                             :
JONATHAN MERCEDES,                                           :
                                                             :  **ORDER GRANTING**
                                      Plaintiff,             :  **DEFENDANTS' MOTION FOR**
        v.                                                   :  **PARTIAL SUMMARY**
                                                             :  **JUDGMENT**
CITY OF NEW YORK, et al.,                                    :
                                                             :  17 Civ. 7368 (AKH)
                                      Defendants.            :
                                                             :
                                                             :
------------------------------------------------------------ X

ALVIN K. HELLERSTEIN, U.S.D.J.:

        This case centers around the arrest, pursuant to the Mental Hygiene law, of a person showing seriously aberrant behavior, conducted by police officers and emergency medical technicians ("EMTs") in response to an emergency call by his mother. On the primary question before the Court—the reasonableness of those first responders' judgment that he posed a substantial risk of physical harm to himself or others—I hold that qualified immunity shields the officers and EMTs from liability.

        Plaintiff Jonathan Mercedes sues Defendants—the City of New York (the "City"); New York Police Department ("NYPD") officers Anthony Amirally, Christopher Boland, Richard Evans, and Kevin Treacy (together, the "Defendant Officers"); and emergency medical technicians Juan Santiago Paulino and Timothy Caraballoso (together, the "Defendant EMTs")—for violations of his federal and state constitutional rights, and injuries resulting therefrom.[1] Both sides move for summary judgment. For the reasons discussed below, Defendants' motion is granted and Plaintiff's motion is denied.

---

[1] Plaintiff represents that he is withdrawing his due process claims (part of Count I), claims against unidentified "Richard Roe" supervisors (Count II), and claims for negligent hiring,

I. **Factual Background**

On the evening of June 29, 2016, Plaintiff's mother, Lisette Wigintton, called 911 to report disruptive and unusual behavior by her son. The recordings of Wigginton's 911 call and radio transmissions to the responding police and EMTs are unavailable.[2] Wigintton testified that she conveyed the following information to the dispatcher:

- Plaintiff "was not acting normal; . . . he was acting a little erratic; lighting up candles, and chanting, and locking himself up in the bathroom with no lights on." Arko Decl. Ex. D, ECF No. 80-4, at 31:25-32:2.

- Plaintiff was "unorganized; he hadn't slept; he wasn't eating appropriately[.]" *Id.* at 52:24-25.

- Plaintiff was off his medication.[3] *Id.* at 53:5-7.

- Plaintiff was "praising Satan." *Id.* at 54:13.

Wigintton testified that she did not recall whether she told the dispatcher that Plaintiff had a psychiatric history. *Id.* at 53:2-4. She testified that Plaintiff was not acting violently, and that she did not tell the dispatcher that Plaintiff was acting violently. *Id.* at 54:20-22.

Two separate and somewhat inconsistent internal reports were generated in response to Wigintton's call. The Sprint report contains typed summaries of what the dispatcher

---

screening, retention, supervision, and training (Count VIII). Pl.'s Opp. at 6. Those claims are dismissed.

[2] Plaintiff characterizes this evidence as "spoliated" and argues that the Court should draw inferences from the missing evidence in Plaintiff's favor. Pl.'s Opp. at 21-24. Defendants argue that the evidence was lost through no fault of their own and that no adverse inferences should be drawn. Defs.' Reply at 17 n.4. The record is insufficient for the Court to resolve the issue.

[3] Plaintiff testified that he had been prescribed Depakote, a prescription mood stabilizer, but that he had not taken it for six months prior to June 29, 2016. Rothman Decl. Ex. 14, ECF No. 86-2, at 54:19-55:8.

2

relayed to the responding police officers over the radio. Arko Decl. Ex. E, ECF No. 80-5, at 46:15-47:4. One entry in the Sprint Report states: "AIDED MALE[4]---PSYCH HISTORY---OFF MEDS---NON VIOLENT---NO WPNS," but another entry states: "CAN BECOME VIOLENT." Arko Decl. Ex. I, ECF No. 80-9, at 1. The Intergraph Computer Aided Dispatch ("ICAD") report was typed by a (presumably different) dispatcher and appeared on a screen inside the ambulance. Arko Decl. Ex. G, ECF No. 80-7, at 41:22-42:5. An entry in the ICAD report states: "NOT ACTING NORMAL . . . BIPOLAR . . . SCHIZO . . . MANICDEPRESSIVE [sic] . . . VIOLENT . . . PICKING UP WEAPONS . . . PSYCH HX . . . ." Arko Decl. Ex. J, ECF No. 80-10, at 1. Defendants do not argue that the Officers had knowledge of the contents of the ICAD report, or that the EMTs had knowledge of the contents of the Sprint report, at the time of arrest.

Plaintiff decided to leave his apartment before anyone came in response to the 911 call. "[He] had a feeling that whoever [Wigintton] was calling for assistance was coming, so [he] tried to leave her house before [he] got in any trouble or got interrogated further." Arko Decl. Ex. B, ECF No. 80-2, at 75:18-21. However, as he was leaving his apartment building, 3280 Rochambeau Avenue in the Bronx, the officers were coming in, and they met in the vestibule of the lobby of the apartment building. Defs.' Rule 56.1 Stmt., ECF No. 81, ¶ 1. One of the officers may have recognized Plaintiff from an interaction earlier that day.[5] Plaintiff tried to leave, but Officer Evans would not let him, using his left arm to block the doorway. Plaintiff asked to be allowed out, and when Officer Evans did not move his arm, Plaintiff pushed it down

---

[4] Responders sometimes use the term "aided" to describe an Emotionally Disturbed Person, or "EDP." Arko Decl. Ex. E, ECF No. 80-5, at 42:6-8.

[5] Plaintiff recalled one of the officers saying, in sum and substance, "you again." *See* Rothman Decl. Ex. 1 at 23:14-24:6.

3

in "a gentle polite manner." *Id.* at 79:7-12. Officer Evans grabbed Plaintiff's arm and handcuffed him behind his back. *Id.* at 81:21-22; *id.* at 85:4-5. Plaintiff testified that the handcuffs were "extremely tight", *id.* at 87:24, and that he complained repeatedly about the severe pain they were causing him. *Id.* at 87:8-21.

As Plaintiff resisted, Officer Evans forcibly brought him to the ground. *Id.* at 81:21-23 ("It was pretty rough. He grabbed me up, just put me in cuffs right away, threw me to the floor. Not, like, head first. You know, my back."), 78:23-24 ("He . . . threw me to the floor."), 84:7-10 ("Like a trip up. . . . I went down pretty easy. It wasn't, like, a super aggressive push."). Evans held him in place with his foot on plaintiff's abdomen. *Id.* at 78:25-79:1 ("He jumped and kind of stepped on me."); Rothman Decl. Ex. 1, ECF No. 78-1, at 29:12-14 ("I was thrown to the floor while in cuffs, and I was stepped on my abdomen—my stomach.").

Plaintiff was lifted onto a gurney, Arko Decl. Ex. B at 94:17, and taken by ambulance to North Central Bronx Hospital, where he was admitted to the psychiatric unit. *Id.* at 100:10-15. Plaintiff received an admission diagnosis of schizophrenia disorder, and was involuntarily hospitalized for three weeks on "emergency status." Arko Decl. Ex. L, ECF No. 80-21, at 000003, 000437; Arko Decl. Ex. B at 108:15-16.

The officers and EMTs testified that they have little or no recollection of the incident:

- Officer Evans recalled that he and Officer Amirally received a call for an emotionally disturbed person ("EDP") at Plaintiff's address, but does not recall any events that took place upon their arrival at the building. Rothman Decl. Ex. 6, ECF No. 78-6, at 22:19-23:17; 24:24-25:13.

- Officer Amirally recalled speaking with Wigintton in Plaintiff's apartment; Plaintiff was not present at that time. Rothman Decl. Ex. 10, ECF No. 78-10, at 28:4-14. Wigintton told Officer Amirally that Plaintiff

4

had a history of bipolar and schizophrenic behavior.[6] *Id.* at 28:15-19. Officer Amirally was inside the building when Plaintiff was handcuffed, and did not observe the encounter. *Id.* at 34:3-34:25. He rode with Plaintiff in the ambulance to the hospital. *Id.* at 56:3-7.

- Officer Treacy, who was on patrol with Officer Boland, did not recall the incident beyond what was reflected in the relevant documents. Rothman Decl. Ex. 2, ECF No. 78-2, at 35:22-36:4.

- Officer Boland, who has since left the NYPD and discarded his memo book, did not have any specific recollection of the incident. Rothman Decl. Ex. 3, ECF No. 78-3, at 17:19-25.

- EMT Santiago Paulino, who responded to the call along with Officer Caraballoso, has no memory of the incident beyond what is recorded in Plaintiff's Prehospital Care Report ("PCR"), Arko Decl. Ex. K, ECF No. 80-11, at DEF000013, which Santiago Paulino prepared. Rothman Decl. Ex. 11, ECF No. 78-11, at 25:2-10. The parties dispute the significance of the PCR card's descriptions of Plaintiff as uncooperative and aggressive.[7]

- EMT Caraballoso also has no memory of the incident. Rothman Decl. Ex. 12, ECF No. 78-12, at 17:21-18:2.

## II. Standard of Review

Summary judgment may be granted if there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In ruling on a motion for summary

---

[6] This information is reflected in an "aided card" from the incident. Rothman Decl. Ex. 8, ECF No. 78-8, at DEF00005. Officer Amirally testified that he discarded the notepad, but that any information in his notes from his conversation with Wigintton first would have been transferred to the aided card. Rothman Decl. Ex. 10 at 37:3-17.

[7] Plaintiff argues that some of the information in the PCR may automatically have been inputted from information about Plaintiff that was already in the system from prior incidents. Pl.'s Opp. at 19-20. However, speculations about the source of information are not evidence.

judgment, a Court must "view the evidence in the light most favorable to the party opposing summary judgment, . . . draw all reasonable inferences in favor of that party, and . . . eschew credibility assessments." *Amnesty Am. v. Town of West Hartford,* 361 F.3d 113, 122 (2d Cir. 2004).

"On a motion for summary judgment, the moving party bears the initial burden of establishing that no genuine factual dispute exists, and, if satisfied, the burden shifts to the nonmoving party to 'set forth specific facts showing that there is a genuine issue for trial.'" *Rueda v. City of New York,* 2017 WL 4221081, at *4 (S.D.N.Y. Sept. 21, 2017) (quoting *Anderson,* 477 U.S. at 256). "When the moving party has carried its burden . . . its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

### III. Discussion

#### a. False Arrest/Unlawful Seizure

Under the New York and federal constitutions, a plaintiff claiming false arrest must show: "(1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Jocks v. Tavernier,* 316 F.3d 128, 134-35 (2d Cir. 2003) (quoting *Broughton v. State,* 37 N.Y.2d 451, 456 (1975)). "The existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest.'" *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir. 1996) (quoting *Bernard v. United States,* 25 F.3d 98, 102 (2d Cir. 1994)). The first three considerations clearly are satisfied. It is the fourth — probable cause to arrest that is in issue.

Because of a police officer's qualified immunity from suit, the standard to justify an arrest is even lower. "Q]ualified immunity protects an officer so long as he had *arguable* probable cause to arrest, which exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Dancy v. McGinley*, 843 F.3d 93, 107 (2d Cir. 2016) (emphasis added) (internal quotation marks omitted).

The asserted basis for Defendants' actions is the New York Mental Hygiene Law § 9.41.[8] Section 9.41 of the Mental Hygiene law authorizes certain state authorities to "take into custody any person who appears to be mentally ill and is conducting himself or herself in a manner which is likely to result in serious harm to the person or others." The phrase "likely to result in serious harm" is defined as:

> (a) a substantial risk of physical harm to the person as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that the person is dangerous to himself or herself, or (b) a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm.

N.Y. Mental Hyg. Law § 9.01. "For a mental health seizure, a showing of probable cause requires 'a probability or substantial chance of dangerous behavior, not an actual showing of such behavior.'"[9] *Mizrahi v. City of New York*, No. 15 Civ. 6084 (ARR), 2018 WL 3848917, at *20 (E.D.N.Y. Aug. 13, 2018) (quoting *Heller v. Bedford Cent. Sch. Dist.*, 144 F. Supp. 3d 596,

---

[8] Secondarily, Defendants argue that probable cause existed to arrest Plaintiff for harassment in the second degree. *See* New York Penal Law § 240.26(1) ("A person is guilty of harassment in the second degree when, with intent to harass, annoy, or alarm another person . . . [h]e or she strikes, shoves, kicks or otherwise subjects such other person to physical contact, or attempts or threatens to do the same."). I do not consider this alternative basis for the arrest.

[9] The same Fourth Amendment objective reasonableness standard that applies to criminal arrests also applies to seizures made pursuant to § 9.41. *Kerman v. City of New York*, 261 F.3d 229, 240 n.8 (2d Cir. 2001); *see also Mizrahi*, 2018 WL 3848917, at *20.

7

622 (S.D.N.Y. 2015)). "[T]o determine whether a mental-health seizure is justified by arguable probable cause, a court must review the specific observations and information available to the officers at the time of a seizure." *Myers v. Patterson*, 819 F.3d 625, 633 (2d Cir. 2016).

When the Defendant Officers came to the scene and encountered the exiting Plaintiff in the vestibule of the apartment building in which he lived, they had been warned that Plaintiff could become violent. The EMT Defendants had been told that Plaintiff was "not acting normal," that he suffered from serious mental disorders, that he was "violent," and that he was "picking up weapons." The Defendants had a right to rely on the information they received from the dispatchers. They knew also that they were responding to a complaint about a mother's emergency call about her uncontrollable son. Is that sufficient to prove "arguable probable cause," justifying an arrest of Plaintiff? Or do issues of fact remain?

We know that the reports erred in material respects. Wigginton told the 9-1-1 operator that her son "was not acting normal," but not that he was acting violently.[10] As the Sprint report reflects, the police dispatcher understood that plaintiff was "non violent" and that there were no weapons, and that it was the dispatcher, not Mrs. Wigginton, who reported to the police officers in the field that plaintiff "can become violent." Mistakes in emergency situations between what one hears and understands, and between what one thinks he understands and instructs another, are common, and every police officer must know that. That probably is why Officer Amirally went to speak with Wigginton, leaving Officer Evans and others to deal with plaintiff. The police were responding to an emergency situation, fraught with danger, but which they were expected to defuse. No easy task!

---

[10] I accept Plaintiff's version of the facts as true for the purposes of this motion.

8

Evans, in barring plaintiff from exiting, was stopping plaintiff from leaving the scene, and it was reasonable for him to do so. A police officer has the right, if he has reasonable basis to do so, to stop a person in order to question him, and that is what Evans did. *See Terry v. Ohio*, 392 U.S. 1 (1968). Evans and his fellow police officers had the right and duty to evaluate whether the dispatcher's report regarding violence and weapons had basis, and reasonably could stop Plaintiff to inquire. Evans and his fellow officers could not discount that Plaintiff was going out to obtain a weapon, and could return brandishing one. They reasonably could have concluded, based on Plaintiff's behavior during the encounter and on the information they had received prior to the encounter, that he posed a substantial risk of physical harm to others. They had sufficient facts to make that determination.

I hold in these circumstances that Defendants had arguable cause to stop plaintiff from exiting and, when plaintiff resisted, to arrest him for "conduct demonstrating that the person [Plaintiff] is dangerous to himself," and that he presented "a substantial risk of physical harm to other persons." N.Y. Mental Hyg. Law § 9.01.

### b. Excessive Force

"Claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor,* 490 U.S. 386, 395. (1989). "Determining whether a use of force was 'reasonable' under the Fourth Amendment 'requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Terebesi v. Torreso,* 764 F.3d 217, 231 (2d Cir. 2014) (quoting *Graham*, 490 U.S. at 396). The question is

9

"whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* (quoting *Graham*, 490 U.S. at 397).

Plaintiff seeks partial summary judgment on his excessive force claim for the way Officer Evans took him down and held him on the floor with his foot. He claims that each of the Defendant Officers is culpable, except Officer Amirally, who was not present. Plaintiff does not seek summary judgment on the portion of his excessive force claim relating to tight handcuffing. Pl.'s Br., ECF No. 77, at 11 n.5. Defendants seek summary judgment on Plaintiff's tight handcuffing claim only as to the Defendant EMTs. They also seek summary judgment on the excessive force claims based on Officer Evans' takedown of Plaintiff.

Officer Evans' takedown of Plaintiff does not constitute excessive force. Officer Evans used reasonable force in response to Plaintiff's resistance, and discontinued its use after Plaintiff had ceased resisting. Plaintiff suffered no bruises or wounds from the incident.

With respect to the Defendant EMTs, there is no evidence that they had any involvement in the Defendant Officers' decision whether and how to subdue and handcuff Plaintiff—a decision squarely within the scope of the officers' responsibilities—and they cannot be held liable for failing to intervene in that conduct. The excessive force claims against them are therefore dismissed.[11] *See Schwartz v. Town of Plainville*, 483 F. Supp. 2d 192, 196 (D. Conn. 2007) (finding "no basis to impute to the EMTs the intentional and allegedly wrongful

---

[11] "[E]xcept for § 1983's requirement that the tort be committed under color of state law, the essential elements of excessive force and state law assault and battery claims are substantially identical." *Humphrey v. Landers*, 344 F. App'x 686, 688 (2d Cir. 2009) (quoting *Posr v. Doherty*, 944 F.2d 91, 94–95 (2d Cir. 1991)) (internal alterations omitted). Summary judgment on Plaintiff's state law assault and battery claims (Count VI), and on the City's *respondeat superior* liability for those alleged state common law torts (Count IV), is inappropriate for the same reasons.

10

conduct of the . . . police officers" where there was no evidence that the EMTs controlled, or could have controlled, the officers' conduct).

Accordingly, Plaintiff's motion for summary judgment on the excessive force claims is denied, and Defendants' motion for summary judgment on the excessive force claims is granted. The only remaining excessive force claim is against the Defendant Officers for tight handcuffing.

### c. Retaliation

"To plead a First Amendment retaliation claim a plaintiff must show: (1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by his exercise of that right; and (3) the defendant's actions caused him some injury." *Dorsett v. Cty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013) (citing *Curley v. Village of Suffern,* 268 F.3d 65, 73 (2d Cir. 2001)).

There is no evidence that Defendants' actions were motivated or substantially caused by any exercise of Plaintiff's exercise of any First Amendment rights. The fact, if true, that at least one of the officers recognized Plaintiff and said "you again" does not support the inference that the officers were motivated to retaliate against the Plaintiff for earlier protected speech. The record is clear that Defendants arrested Plaintiff in response to his mother's 911 call and his conduct upon their arrival at the building, and the only questions in this case are whether there was a reasonable basis for that arrest, and whether it was carried out in a reasonable manner. Thus, Plaintiff's First Amendment retaliation claim is dismissed.

### d. Equal Protection

Defendants move for summary judgment on Plaintiff's equal protection claim under the Fourteenth Amendment and § 1983. "To state a race-based claim under the Equal Protection Clause, a plaintiff must allege that a government actor intentionally discriminated against him on the basis of his race." *Brown v. City of Oneonta, New York*, 221 F.3d 329, 337 (2d Cir. 2000). There is no evidence that Plaintiff, who is Latino, was treated differently on the basis of his race or any other protected status. According to Plaintiff, the NYPD Internal Affairs Bureau is investigating Officer Evans for using discriminatory language in unrelated incidents. Pl.'s Opp. at 10-11. Absent any evidence of differential treatment or discriminatory intent *in this case*, however, that fact alone is insufficient to defeat summary judgment. Plaintiff's equal protection claim therefore is dismissed.

### e. *Monell* Claims

"To bring a section 1983 lawsuit for municipal liability, 'a plaintiff must prove that action pursuant to official municipal policy caused the alleged constitutional injury.'" *Hu v. City of New York*, 927 F.3d 81, 104 (2d Cir. 2019) (quoting *Cash v. Cty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011)). Plaintiff argues that the disciplinary records of Officers Evans and Amirally "demonstrate the longstanding, systemic deficiencies ingrained within the NYPD's disciplinary system." Pl.'s Opp. at 11 (citing Rothman Decl. Exs. 20, 22, ECF Nos. 86-8, 86-9). However, Plaintiff provides no details regarding the officers' uses of excessive force in prior incidents of alleged misconduct; no information about the personnel and departments that handled, or should have handled, complaints about the officers involved; and no information about the NYPD's reasons, or purported reasons, for not acting on these complaints. These deficiencies in the

record distinguish this case from the case relied on by Plaintiff, *Jenkins v. City of New York*, 388 F. Supp. 3d 179, 192 (E.D.N.Y. 2019), where the plaintiff presented extensive documentary and testimonial evidence of the City's persistent failure to investigate credible complaints. Because no reasonable jury could conclude, on this record, that the City had a policy of failing to investigate and discipline Officers Evans and Amirally for misconduct, Plaintiff's *Monell* claims against the City (Count III) are dismissed.

### f. Negligence Claim

"Under New York law, a plaintiff may not recover under general negligence principles for a claim that law enforcement officers failed to exercise the appropriate degree of care in effecting an arrest or initiating a prosecution." *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994). Plaintiff's negligence claim (Count VII), which is premised on the same facts as his excessive force and assault and battery claims, is dismissed.

### g. Trespass and State Constitutional Tort Claims

Likewise, Plaintiff's claims for trespass on his person are dismissed as duplicative of his assault and battery claims. His claims under various provisions of the New York State Constitution (Count IX) are dismissed as duplicative of his federal constitutional claims.[12] *See, e.g.*, *Mesa v. City of New York*, No. 09 Civ. 10464 (JPO), 2013 WL 31002, at *33 (S.D.N.Y. Jan. 3, 2013) (granting summary judgment in favor of defendants on various New York constitutional

---

[12] Plaintiff's argument that a different standard applies to state and federal free speech claims is irrelevant, since, as discussed above, I dismiss those claims for lack of any evidence to support retaliation.

13

claims, where claims asserted under state common law and federal constitutional analogs adequately protected the interests at stake).

## IV. Conclusion

For the reasons stated above, Plaintiff's motion for partial summary judgment is denied, and Defendants' motion for partial summary judgment is granted. Counts II, III, V, VII, VIII, and IX are dismissed in their entirety. As to Count I, all § 1983 claims are dismissed except the excessive force claim for tight handcuffing against the Defendant Officers. Plaintiff's assault and battery claim (Count VI), and *respondeat superior* claim against the City for those violations (Count IV), which Defendants do not move to dismiss, also shall go forward.

The parties shall appear for a status conference on October 25, 2019 at 10:00 a.m. The Clerk shall terminate the open motions (ECF Nos. 75, 79, 93).

SO ORDERED.

Dated: October 4, 2019
New York, New York

ALVIN K. HELLERSTEIN
United States District Judge